**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAVAN TOOLEY,<br><br>Defendant. | Criminal Action<br>No. 25-cr-10374-PBS |

**MEMORANDUM AND ORDER**

October 19, 2026

Saris, J.

**INTRODUCTION**

Defendant Javan Tooley is charged with distributing and possessing with intent to distribute twenty-eight grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii). Tooley moves to suppress evidence obtained during the execution of federal warrants to search his house, car, and cell phones. He argues that the affidavits in support of the warrants failed to establish probable cause to believe that evidence of drug trafficking would be found in his house or car and that the warrants' authorization to seize and search his cell phones lacked particularity.

After a non-evidentiary hearing, the Court **DENIES** Tooley's motion to suppress (Dkt. 87).

**BACKGROUND**

On September 22, 2025, Task Force Officer James Smith ("TFO Smith"), a member of the Federal Bureau of Investigation's Human Trafficking and Child Exploitation Task Force, applied for warrants to search Tooley's house, car, and digital devices. TFO Smith's affidavit in support of the application described the following facts.

Agents began investigating Tooley for sex trafficking in November 2020. In early 2025, a cooperating witness ("CW-1") reported that Tooley was distributing drugs and was using a certain cell phone number to communicate with her over FaceTime regarding drug trafficking. Agents provided CW-1 with a device to record audio from her FaceTime calls with Tooley.

Starting in July 2025, CW-1 recorded multiple FaceTime calls with Tooley during which Tooley discussed providing crack cocaine to CW-1. On the morning of September 10, 2025, Tooley told CW-1, "I think I've got like three and a half [ounces] and I can have the rest for you tonight, if not tomorrow." Dkt. 93-1 ¶ 13. When CW-1 asked to "see it on the scale," Tooley responded, "Look right here, look." Id. CW-1 told Tooley not to adulterate the drugs, and Tooley showed CW-1 how he cooked crack cocaine, saying "I cook under water . . . See, it's no whiteness." Id. Tooley told CW-1 over FaceTime and via text message from the same number to meet him shortly thereafter at Fields Corner in Dorchester. He told her

he was in a hurry because he had "to bring [his daughter] to class." Id. ¶ 14.

That afternoon, agents and CW-1 prepared for a controlled purchase from Tooley. CW-1, equipped with recording devices, approached a Honda Pilot SUV that was parked near the address for a nonprofit Tooley operated. The car had been purchased by Tooley and was registered to an address in Plymouth, Massachusetts, where CW-1 advised that Tooley's stepbrother lived. After approaching the car, CW-1 entered the front passenger seat. Agents saw Tooley in the driver's seat of the car, and CW-1 observed a young child in the backseat. CW-1 informed the agents that after she told Tooley she had payment for the drugs, Tooley reached into the backseat, pulled out two bags containing a rocky substance, and gave them to her. Tooley told CW-1 he thought he owed her more drugs. CW-1 left the car, and as she was walking away, Tooley called her via FaceTime. During this call, which was recorded, Tooley told CW-1 he had just cooked the cocaine, said a portion of it still needed to dry, and reiterated that he owed her more drugs. CW-1 immediately met with the agents, who took possession of the bags and determined that they contained 109 grams of cocaine.

With this information, agents obtained federal warrants for location data for the cell phone Tooley was using to communicate with CW-1 on September 16. Over the following days, Tooley

confirmed to CW-1 via recorded text messages and FaceTime that he owed her more drugs and had more cocaine to sell her.

On September 17, an agent observed the Honda Pilot parked around midnight in the driveway of a house in Brockton, Massachusetts, owned by Tooley's long-time girlfriend and the mother of his child. Two days later, agents saw Tooley take out the trash at the same house early in the morning and then leave the house. Location data for the cell phone showed that Tooley returned to the house at 4:00 a.m. the following night and then remained at the house overnight the next two days.

Based on TFO Smith's affidavit recounting these facts, the magistrate judge issued warrants on September 22, 2025, to search the Brockton house and the Honda Pilot, to seize evidence of drug trafficking and digital devices, and to search the digital devices. When agents arrested Tooley in the Honda Pilot, they seized $1,000 and two cell phones, including the one he used to communicate with CW-1. That cell phone contained CW-1 as a contact and FaceTime communications between Tooley and CW-1 leading up to his arrest. Agents also recovered a plastic bag containing 163 grams of cocaine base from the car. At the house, agents seized three digital scales with cocaine residue, four plastic bags containing pounds of marijuana, $3,282 in cash, and documents in Tooley's name.

## DISCUSSION

### I. Nexus to Car and House

Tooley first argues that TFO Smith's affidavit failed to demonstrate probable cause to believe that evidence of criminal activity would be found in the Honda Pilot or in the Brockton house. Tooley stresses that the affidavit offered no evidence that he travelled from the house to the controlled purchase or went to the house afterwards and that agents did not see any criminal activity when they surveilled the car or the house. In Tooley's view, the affidavit relied on conclusory assertions and assumptions based on TFO Smith's training and experience that are insufficient to establish a nexus between drug trafficking and the car or the house. Tooley also argues that the twelve-day gap between the controlled purchase with CW-1 and issuance of the warrants rendered stale any information tying drug trafficking to his car or the house.

The Fourth Amendment mandates that warrants be based on probable cause. See U.S. Const. amend. IV. "Probable cause 'is not a high bar'" and demands "only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." United States v. Baxter, 179 F.4th 73, 83 (1st Cir. 2026) (alteration in original) (quoting United States v. Cortez, 108 F.4th 1, 8 (1st Cir. 2024)). The probable cause inquiry is two-fold: a warrant application "must demonstrate probable cause to

believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched -- the so-called 'nexus' element." United States v. Daigle, 178 F.4th 55, 61 (1st Cir. 2026) (quoting United States v. Gonzalez, 113 F.4th 140, 148 (1st Cir. 2024)). In other words, there must be "a 'fair probability -- not certainty -- that evidence of a crime will be found in a particular location.'" United States v. Deschambault, 176 F.4th 9, 16 (1st Cir. 2026) (quoting United States v. Lindsey, 3 F.4th 32, 39 (1st Cir. 2021)). Satisfaction of the nexus element "may be 'inferred from the type of crime, the nature of the items sought, . . . and normal inferences as to where a criminal would hide [evidence of a crime].'" Id. (alterations in original) (quoting Lindsey, 3 F.4th at 39).

The probable cause standard "include[s] a temporal component" that requires a determination of "'whether the totality of the circumstances . . . ' establishes a fair probability that evidence of the crime will be found in the place to be searched 'at about the time the search warrant would issue, rather than at some remote time.'" Gonzalez, 113 F.4th at 148 (alteration in original) (quoting United States v. Zayas-Dias, 95 F.3d 105, 113 (1st Cir. 1996)). "Information in an affidavit is stale if it 'establishe[s] probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance.'" Id.

(alteration in original) (quoting United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015)). A court does not "assess an affidavit's staleness [simply] by counting the number of days between the events described in the affidavit and a warrant's issuance." United States v. Adams, 971 F.3d 22, 33 (1st Cir. 2020) (quoting United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011)). Rather, a court must undertake a "context-dependent" inquiry that accounts for "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Encarnacion, 26 F.4th 490, 498 (1st Cir. 2022) (quoting United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008)).

To determine "whether a finding of probable cause is justified," courts "look to the totality of the circumstances as they are set forth in the warrant application and its accompanying affidavit." Baxter, 179 F.4th at 83 (quoting United States v. Sheehan, 70 F.4th 36, 44 (1st Cir. 2023)). An "affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." Adams, 971 F.3d at 32. Courts must also "'accord[] deference to the reasonable inferences' that the magistrate judge issuing the search warrant 'may have drawn' from the facts stated in the affidavit." Daigle, 178 F.4th at 60-

61 (alteration in original) (quoting United States v. Coleman, 149 F.4th 1, 23 (1st Cir. 2025)).

The facts recounted in TFO Smith's affidavit sufficed to establish probable cause to believe evidence of criminal activity would be found in the Honda Pilot. Tooley transported drugs to the controlled purchase with CW-1 in the Honda Pilot and conducted the transaction in the car. This use of the Honda Pilot to transport and sell drugs supported a fair probability that evidence of drug trafficking would be found in the car. See United States v. White, 804 F.3d 132, 137 (1st Cir. 2015) (finding probable cause to search a car where the defendant arrived to and completed two controlled purchases in the car); United States v. Goncalves, 642 F.3d 245, 249 (1st Cir. 2011) (same where the car "had . . . been used for a prior drug delivery to the informant superintended by the authorities").

The affidavit also demonstrated a sufficient nexus between Tooley's drug trafficking and the Brockton house. Agents' surveillance of the property and the location data from Tooley's cell phone supported a reasonable -- indeed, strong -- inference that Tooley was living at the house. And during their September 10 FaceTime calls before the controlled purchase, Tooley showed CW-1 how he was cooking the cocaine himself and weighed the drugs on a scale. It was reasonable for the magistrate judge to infer that Tooley was preparing drugs for sale at the house where he was

living even though his car was registered to another address. While this conclusion may not have been a "certainty," the probable cause standard is not so high. Deschambault, 176 F.4th at 16 (quoting Lindsey, 3 F.4th at 39). These "specific observations . . . connecting the drug dealing to [Tooley's] home," in combination with TFO Smith's "'generalized observations' that 'drug dealers tend to store evidence in their homes,'" established a fair probability that evidence of drug trafficking would be found in the Brockton house. United States v. Leonard, 17 F.4th 218, 228 (1st Cir. 2021) (quoting United States v. Roman, 942 F.3d 43, 51-52 (1st Cir. 2019)); see id. (noting that "evidence that drug distribution [i]s being organized from [the defendant's] residence" supports probable cause to search the residence (second alteration in original) (quoting United States v. Keene, 341 F.3d 78, 82 (1st Cir. 2003))).

Nor did the twelve-day gap between the controlled purchase with CW-1 and issuance of the warrants render the information in the affidavit stale. The First Circuit has routinely rejected arguments that information about drug trafficking was stale after the passage of even longer periods of time when, as here, the information indicated that the defendant was engaged in ongoing trafficking operations. See, e.g., United States v. Gonzalez-Arias, 946 F.3d 17, 25 (1st Cir. 2019) (finding probable cause for search of apartment where over seven months had passed since last

controlled buy and the defendant had made drug trafficking-related calls and trips from the building one month earlier); United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (same for search of home where "the drug transactions described in the affidavit took place approximately three months prior to issuance of the warrant").

## II. Particularity of Cell Phone Searches

Tooley next contends that the warrants were insufficiently particularized because they broadly authorized the search and seizure of his cell phones. He appears to contend that given the vast array of information stored on cell phones and other digital devices, the warrants should have only authorized the search of specific devices and/or some subset of their contents.

In addition to the probable cause requirement, the Fourth Amendment demands that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." United States v. Corleto, 56 F.4th 169, 176 (1st Cir. 2022) (alteration in original) (quoting U.S. Const. amend. IV). "The general rule is that the scope of a search 'is defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" Deschambault, 176 F.4th at 17 (quoting United States v. Ross, 456 U.S. 798, 824 (1982)). The particularity requirement encompasses "two distinct demands": a "valid warrant '(1) must supply enough information to guide and

control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized.'" Id. (quoting Coreleto, 56 F.4th at 176).

The First Circuit's recent decision in Deschambault addressed the application of the particularity requirement to evidence of drug trafficking on cell phones. See id. at 17-20. There, the warrant authorized a search of the defendant's cell phone "for evidence that would '[p]ertain to [his] use of the [cell phone] to engage in the crime of Aggravated Trafficking in Schedule W Drugs" or that would "[d]emonstrate ownership, possession or use of the [phone], or the data contained therein." Id. at 17 (first and fourth alterations in original). The warrant also permitted the search of "[r]ecords, documents or data" such as photographs and videos, electronic communications, data files, location data, and records of online activity. Id. (alteration in original). While "acknowledg[ing] the concern that cell phones today include vast amounts of personal data," the First Circuit found the warrant adequately particularized because the "supporting affidavit . . . tied the [cell phone] believed to belong to [the defendant] directly to the alleged trafficking activity" and the warrant "limited the search" to evidence pertaining to the defendant's use of the cell phone for drug trafficking or demonstrating ownership, possession, or use of the cell phone. Id. at 18-19. The First

Circuit added that "the issuing state court judge" did not have "to confine the search to only selected phone functions or applications," such as text messages and call logs, given that "cell phone evidence of drug trafficking often extends beyond calls and text messages to photographs, videos, and other stored digital material." Id.

Under Deschambault, the warrants here comported with the Fourth Amendment's particularity requirement. TFO Smith's supporting affidavit described Tooley's use of a cell phone to further his drug trafficking activities (i.e., his sale of cocaine to CW-1). The warrants, in turn, authorized agents to search for records and objects pertaining to drug trafficking, financial proceeds and assets, and occupancy of the Brockton house. **[Dkt. 93-1 at 28-29]**. They also permitted agents to search on cell phones and other computer equipment for evidence of ownership and use, passwords, and data-deleting and malicious software. **[Id.]** Under these circumstances, the warrants were sufficiently particularized even though they allowed agents to broadly search cell phones found in the target locations for evidence of drug trafficking.

## III. Location Warrants

Finally, in a perfunctory footnote, Tooley challenges whether probable cause existed for the federal warrants issued on September 16, 2025, to track the location of the cell phone he was using to communicate with CW-1. This challenge is fatally undeveloped and,

thus, waived. See United States v. Gonzalez, 814 F. Supp. 3d 214, 224 n.5 (D. Mass. 2026); United States v. Kelley, 404 F. Supp. 3d 447, 455 (D. Mass. 2019); United States v. Bey, 52 F. Supp. 3d 299, 306 n.2 (D. Mass. 2014). It is also meritless. The controlled purchase with CW-1 demonstrated that Tooley was engaged in trafficking substantial quantities of drugs and using the cell phone for this purpose. Evidence of the cell phone's location would, among other things, help to confirm Tooley's identity and reveal where Tooley was acquiring, processing, storing, and/or selling the drugs. See United States v. Gonzalez, No. 22-cr-40017, 2025 WL 307248, at *9 (D. Mass. Jan. 27, 2025) (finding probable cause for warrant for cell phone location data where the affidavit established that the phone's user was engaged in drug trafficking and used the phone to that end).

**ORDER**

For the foregoing reasons, Tooley's motion to suppress (Dkt. 87) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge